**In re BLONDHEIM MODULAR MANU-FACTURING, INC., Debtor.**

**J. Michael DEASY, Trustee, Plaintiff,**

v.

**DERNHAM COMPANY.**

**Bankruptcy No. 85-223.**

United States Bankruptcy Court,
D. New Hampshire.

Sept. 30, 1986.

Daniel Callaghan, Manchester, N.H., for trustee, plaintiff.

J. Christopher Marshall, Manchester, N.H., for unsecured creditors committee.

Robert Backus, Manchester, N.H., for Dernham Co.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This matter was tried before the court on the Trustee's Motion to Determine Claim of Dernham Company and to Order Other Relief, as amended, and Dernham Company's answer thereto. Subsequently, both the Chapter 11 trustee and the Dernham Company provided this court with memoranda in support of their respective positions and the unsecured creditors' committee also filed a response. The dispute basically involves damage claims by the debtor's lessor, Dernham Company, relating to the termination of the lease for nonpayment of rent commencing January 1, 1985. The lessor was subsequently able to close a sale of the property in question, on May 13, 1985, for a purchase price of $1,287,500.00.

As a result of the debtor's default and the subsequent termination of the Lease, the lessor seeks unpaid rent from the trustee from January 1, 1985 through May 13, 1985, less the amount of the security deposit and any payments made by the purchaser of the property from February 18, 1985 to May 13, 1985. The Creditor also seeks recovery of late charges at the annual rate of 60 percent, interest at the annual rate of 24 percent, and expenses of approximately $55,000.00, including a broker's commission of $40,000.00 for the sale of the Premises. Finally, the Creditor seeks recovery of attorneys' fees and expenses in an amount in excess of $23,000.00 for instituting collection and eviction proceedings.

The trustee concedes an allowable rent claim from January 1, 1985 through February 18, 1985, in the amount of $26,285.65, together with miscellaneous charges and damages relating to the vacation of the premises in the amount of $1,900.98. The trustee disputes any allowance of a broker's commission, relating to the sale of the premises, and any rent claim beyond February 18, 1985. The trustee then asserts that the total claim of $28,186.63 should be set off against the security deposit held by the lessor in the amount of $32,736.07, leaving a net amount due to the trustee of $4,549.44 from the security deposit. The trustee recognizes that the court may allow reasonable attorney's fees and expenses to the lessor with regard to instituting the collection and eviction proceedings. Any such allowances could reduce and/or eliminate the amount due the trustee under his contention.

## GENERAL FINDINGS

On May 22, 1985 Blondheim Modular Manufacturers, Inc., a New Hampshire corporation ("debtor") filed with this court an original petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code. On June 6, 1985, this court appointed J. Michael Deasy as trustee over the debtor and all assets of the debtor. Prior to his appointment as trustee, Mr. Deasy was the receiver of the debtor pursuant to an order of the Hillsborough County Superior Court on April 4, 1985.

On November 16, 1984, Dernham Company, a New Hampshire general partnership, and Blondheim Modular Manufacturers, Inc., a New Hampshire corporation, entered into a lease for certain real property and buildings situated in Derry and Lon-

donderry, Rockingham County, New Hampshire. Pursuant to that lease, as of January 1, 1985 Dernham Company held a security deposit from the debtor in the amount of $32,736.07. On January 2, 1985, Blondheim failed to pay the rent due Dernham for the month of January.

Dernham made several demands for payment of the rent due and on January 16, 1985 took the position that the lease had been terminated by default in payment of rent. Dernham proceeded immediately to telephone several brokers concerning the re-renting or sale of the property. However, no formal *listing* with any broker was made for sale or rent of the property by these informal contacts. One of the brokers contacted was Codman Company, Inc., a broker who had presented Merrimack Valley Wood Products, Inc. as a potential buyer for the premises in question to the Dernham Company in 1982 and 1983. Dernham proceeded forthwith to negotiate a sale of the property to Merrimack Valley as a result of those telephone contacts. I specifically find on the preponderance of the evidence that Dernham never *listed* the property for *sale or rent* with brokers, or if it did so any such effort was short-lived and in no event extended beyond the end of the month of January.

On February 2, 1985 the Dernham Company changed the locks on the premises and denied the debtor access to the premises. On February 4, 1985 Dernham Company negotiated with Merrimack Valley Wood Products, Inc. a sale of the premises and reached an oral agreement for the sale. The premises in question contained 76,000 square feet and covered an eight-acre tract.

On February 18, 1985 Dernham Company agreed in writing to sell the premises to Merrimack Valley Wood Products, Inc. or its nominee, for the sum of $1,287,500.00. On February 18, 1985 Dernham Company and Merrimack Valley Wood Products, Inc. ("M.V.W.P.") also executed an Occupancy Agreement wherein M.V.W.P. would occupy the entire premises as of February 18, 1985 and pay to Dernham Company all costs associated with ownership of the premises including, but not limited to, real estate taxes, insurance, utilities, and an amount equal to Dernham's mortgage payments. On or about May 13, 1985, Dernham Company received the purchase price for the premises from Merrimack Valley Wood Products, Inc.

Under the terms of the purchase and sale agreement between Dernham Company and M.V.W.P., Dernham Company did not pay a broker's commission until Dernham Company received the purchase price and transferred title to M.V.W.P. Under the terms of that purchase and sale agreement, Dernham Company could not enter into a lease for the premises after February 18, 1985, i.e., pursuant to its purchase and sale and Occupancy Agreements with M.V. W.P., Dernham Company agreed that it would not re-rent the premises without the agreement of that buyer-lessee.

On or about May 14, 1985 Dernham Company caused certain personal property of the debtor, consisting of "modular home" units, to be removed from the building on the premises and stored outside. This property which was stored outside, sustained water damage in the approximate aggregate amount of $2,000.00.

A comparison of the two "leases" involved in this case shows that the November 16, 1984 lease agreement between the debtor and Dernham Company contained the following terms: According to Article II of the Lease, Dernham agreed to let the premises to Blondheim for an initial term of 30 months. The Blondheim tenant agreed to pay a base rent of $16,000.00 per month during the first year of the lease term (Article III). Pursuant to Articles IV and VII.10, "[i]n order that all rent ... shall be absolutely net to the landlord, tenant ... agrees to pay, as additional rent, taxes, betterment assessments, insurance costs, utilities, and all costs of repair and replacement" including all real estate taxes; betterment assessments and the costs and expenses tenant incurs in proceedings brought to contest same; fire insurance with extended coverage endorsement, comprehensive general liability insurance cov-

ering both landlord and tenant, Workman's Compensation Insurance, boiler insurance, Builder's Risk Insurance, rent continuation insurance; and all water, gas, heat, light, power, telephone, and all other utilities; cleaning and maintenance services and snow removal.

Under the terms of the lease between the debtor and Dernham, the debtor as tenant, agreed in Article XII of the Lease (entitled "Landlord's Remedies") that if the lease is terminated the tenant is obligated for all unpaid rent until that date and for the further rent that would have become due for the remaining lease term had the lease not been terminated. This Article of the lease then continues with the following pertinent provision:

In addition to the foregoing, Tenant agrees (1) to *indemnify and save Landlord harmless from and against all expenses* (together with interest on such expenses at the rate of 2 percent per month) *which Landlord may incur in collecting such amounts in obtaining possession of, or in re-letting the Premises*, or in defending any action arising as a result of or in connection with a default, *including, without limitation, legal expenses, attorneys' fees, brokerage fees, and the cost of putting the Premises in good order or preparing the same for rental*; (2) that Landlord may re-let the Premises or any part or parts thereof, either in the name of Landlord or otherwise for a term or terms which may, at Landlord's option, be less than or exceed the period which would otherwise have constituted the balance of the term and may grant concessions or free rent for a reasonable time. *The good faith failure of Landlord to re-let the Premises or any part thereof shall not release or affect Tenant's liability for damage.* Any suit brought to collect the amount of deficiency for any month shall not prejudice the right of Landlord to collect the deficiency for any subsequent month by a similar proceeding. Landlord may make such alterations, repairs, replacements and decorations on the Premises *which in Landlord's sole judg-ment are advisable or necessary for the purpose or re-letting the Premises,* and the making of such alterations or decorations shall not release Tenant from any liability. In the event the Premises are re-let by Landlord, *Tenant shall be entitled to a credit in the net amount of rent received by Landlord, after deduction of all expenses incurred in connection with Tenant's default,* re-letting the Premises and in collecting the rent. [Emphasis supplied]

Turning to the terms of the February 18, 1985 Occupancy Agreement by which M.V. W.P. leased from Dernham, the premises formerly occupied by the Blondheim tenant and which Dernham and M.V.W.P. made part of their purchase and sale agreement, paragraph 2 of that Occupancy Agreement provided that:

Lessee shall pay as monthly rent to the Lessor, in advance, on the first of each month while this Agreement is in force, following amounts: (a) an amount equal to Lessor's mortgage payment which is $6,762.50. For the month of February, Lessee will pay upon execution of the Purchase and Sale Agreement a prorated share of said mortgage payment equal to $4,105.80; (b) an amount equal to the taxes assessed by the Town of Derry for the real estate and buildings and accruing thereon; $1,844.00 upon execution and $3,300.00 on March ___, 1985 and $1/12$ of the estimated 1986 taxes to be paid on the first of each month thereafter until closing or termination hereof, all such payments are to be prorated at the time of closing; (c) Lessee shall pay for all water and sewer charges, electricity, gas and other utilities supplied to the Premises and shall contract for the same in its own name.

Additionally, under paragraphs 3 and 5 of the Occupancy Agreement, M.V.W.P. was responsible for purchasing fire insurance and general liability insurance covering both the landlord and the tenant. M.V. W.P. was also to "maintain the existing alarm contract and system and telephone

lines". Further, paragraph 6 required that:

> Lessee shall be responsible for all routine maintenance, including, but not limited to, janitorial, electrical, plumbing, sprinkler, heating, roof maintenance and repairs and snow removal. Lessor shall be responsible for all major structural repairs.

Dernham did not get from the new Buyer-Lessee, Merrimack Valley Wood Products, Inc., funds equivalent to the $16,000.00 in rent which the Blondheim tenant's lease called for. Rather, M.V.W.P. paid for all the same items, such as utilities, which the Blondheim tenant was required by its lease to pay for, but the difference in the obligations of the two tenants was the $16,000.00 versus $6,762.50 "rent" per month, and it is this difference which Dernham is primarily claiming as damages resulting from debtor's pre-petition breach of its commercial real estate lease with the Dernham Company.

## BREACH OF LEASE DAMAGES

■ While Article XII of the 1984 lease between the debtor and Dernham Company is not a model of clarity in contractual drafting, it is my conclusion that the crucial paragraph quoted above *when read in its entirety* is intended to limit the landlord to recovering costs and charges of "re-letting" the premises and does not indemnify the landlord for cost of obtaining a sale of the premises. The landlord's position here is essentially based upon taking the word "brokerage" out of context and further giving an unwarrantedly broad construction to the words "in connection with tenant's default" in the concluding sentence of the paragraph. I believe on the contrary that the entire paragraph, and particularly those portions which have been emphasized in the set forth above, make it clear that this provision has to do only with "re-letting" of the premises.

The lessor in this case does make the argument that re-leasing premises of the nature of the subject premises in the middle of the winter, with their sizable extent and outlying location, could well have required a number of months and perhaps a year to get a suitable tenant. There is testimony in the record to this effect. The lessor then argues that it is unfair to deny it damages in those circumstances. However, this just amounts to the lessor arguing that it should be able to "have its cake and eat it too" since I have found that Dernham Company *elected* to proceed immediately to sale rather than to attempt to re-rent the premises in any serious way. Having done that, Dernham has no convincing equitable argument that it should also have compensation for a "usual period of delay in re-renting the premises" which factually just did not happen in this case.

An "interim lease" until the time of the closing of the sale with M.V.W.P. created an artificial situation in which the monthly payments denominated as "rent" paid by M.V.W.P., cannot be considered to be a "reasonable rent". Therefore, the lessor in this case must be deemed to have elected to accept a surrender of the premises from the Blondheim tenant, in the sense that the lessor did not simply receive them and hold the same for "the account of the tenant" for re-renting and an ultimate claim for any differential rent damages suffered. Having accepted a surrender of the lease for the purpose of seeking immediate sale of the property, the lessor is not be entitled to any rent damages in the circumstances.

■ There is no direct authority on this point in New Hampshire but the court is persuaded by the reasoning in *Wilson v. Ruhl*, 277 Md. 607, 356 A.2d 544 (1976), in which the Court of Appeals of Maryland held that a duty to mitigate a tenant's damages following a breach of a lease and repossession by the lessor is not satisfied by a listing of the property for purposes of sale only. Put another way, the landlord will be deemed to have accepted surrender of the leased premises, for its own account, rather than for the account of the tenant, where the landlord seeks to sell the leased premises rather than reletting the same. *Millison v. Clarke*, 287 Md. 420, 413 A.2d

198 (1980). It is clear in the present record that at least by February 18, 1985 Dernham Company had abandoned any effort to rent the premises and was proceeding with the sale of the same. As indicated above, the so-called "rent" received under the contract for sale was not determined in terms of arms-length bargaining for a true "rental rate" in a leasing situation, but was necessarily tied to the terms of the underlying sales contract and establishes no true rental value for mitigation purposes.

■ Dernham Company argues however that it is not established that there *is* any duty to mitigate damages in this landlord-tenant situation in New Hampshire. The only case decision cited by either party which is anywhere close to this point in New Hampshire is the decision in *Novak v. Fontaine Furniture Co.*, 84 N.H. 93, 146 A. 525 (1929). While the opinion in the *Novak* case is somewhat ambiguous as to its ultimate effect, I conclude on balance that the Supreme Court of New Hampshire has indicated that a repossessing landlord in the position of Dernham Company in the present case would be obligated to take reasonable efforts to curtail the loss of the ousted tenant if it seeks to hold the tenant for damages for the entire balance of the original leasehold term. [See 84 N.H. at pp. *95–97*, 146 A. 525]. The primary issue in dispute in the *Novak* case was on another point, i.e., whether a reletting of the premises *without notice to the tenant* constitutes a waiver of any damages claim. However, there is dicta in the opinion supporting a duty to mitigate damages once it is established that the landlord *is* in a position to claim reimbursement from the ousted tenant for the balance of the leasehold. [See 84 N.H. at pp. 96, 146 A. 525].[1]

Accordingly, on the portion of the Dernham claim relating to unpaid rent damages, and related items covered by the lease, I conclude that as a matter of law on the facts presented the trustee is correct and that no rent damages are allowable at any time subsequent to the entering into by Dernham of a binding contract for sale of the premises on February 18, 1985. Dernham Company is entitled to a claim for damages in the amount of $28,186.63, for breach of its lease by the debtor, together with such reasonable attorneys fees and expenses as may be allowed by the court with regard to collection and eviction proceedings pursued against the debtor.

## PERSONAL PROPERTY DAMAGES

■ With regard to the further issue presented for the court's consideration i.e., the *trustee's claim* for a money damages offset for loss to debtor's personal property caused by inclement weather, due to the landlord's alleged failure to properly protect the modular home units when they were moved outside, I find from the evidence that the trustee simply failed to prove any lack of reasonable care in the circumstances. Therefore, any damage that may have resulted from weather prior to the bankruptcy auction sale of said property was not "unnecessary damage" within the meaning of *Weeks v. Sly*, 61 N.H. 89 (1881).

The landlord, Dernham, incurred costs of $9,424.00 in removing and covering the modular home units while they were to be stored outside after the new buyer-lessee, Merrimack Valley Wood Products, Inc., moved into the premises formerly occupied by the debtor. The evidence convinces this court that the Dernham Company did what was reasonable in the circumstances, that the charge it received from the outside contractor who did the covering and sealing of the units was a reasonable charge, and that Dernham cannot be held to an obligation to have advanced even further funds, which the evidence indicates would have been considerably more, to obtain absolute weather protection. Moreover, there is no preponderance of the evidence

---

1. "In any case involving a breach of contract the plaintiff must make reasonable effort to curtail his loss." Cf. later cases applying this general principle and citing the *Novak* decision: *Brew Company v. Auclair*, 106 N.H. 370, 374, 211 A.2d 897 (1965); *Emery v. Calendonia*, 117 N.H. 441, 448, 374 A. 929 (1977).

showing the alleged $2,000.00 damage to the modular home units. The testimony submitted by the trustee by deposition of a Mr. Larry Gray was at best speculative. Mr. Gray did not indicate any great expertise in the matter in question.

Accordingly, the Dernham Company is entitled to claim a $9,424.00 charge for covering and sealing the modular units in order to store them outside, without any offset or reduction due the trustee for the alleged $2,000.00 in damage to the units from the weather while stored outside.

### ATTACHMENT LIEN CLAIM

The foregoing determinations indicate that Dernham Company holds valid claims for damages in a total amount of $37,-610.63 in this matter, plus additional attorneys fees and costs that may be allowed by the court. This total claim obviously will exhaust the $32,736.07 security deposit being held and will leave no net amount due from that security deposit to the trustee. However, this "excess claim" held by Dernham Company over the amount of the security deposit makes it necessary to consider and determine Dernham Company's further assertion that it has a valid attachment lien against the debtor's personal property which was stored upon the premises in question at the time of the bankruptcy filing on May 22, 1985. By stipulation of the parties, this personal property was sold at bankruptcy auction in September of 1985 and the proceeds, totalling some $90,000.00, remain subject to claim of liens by Dernham Company for any unrecovered damages in excess of its security deposit.

The trustee has resisted this lien claim asserted by Dernham Company on the basis that their was no valid attachment lien in effect under New Hampshire law on or before February 21, 1985—a date which would have been ninety days before the bankruptcy filing. Although not very well articulated in the trustee's pleadings or brief, this contention apparently is based upon a position that any such attachment lien which became effective after that date

would be a voidable preference under § 547 of the Bankruptcy Code, i.e., the obtaining of lien status and accordingly a preferred position by an otherwise unsecured creditor within the statutory period.

This contention by the trustee raises very difficult questions of state statutory law dealing with the obtaining of attachments and attachment liens in New Hampshire. To reach an appropriate determination on this question it will be necessary to set forth the factual and statutory background in some detail.

On January 30, 1985 Dernham Company obtained a Hillsborough County Superior Court Order granting its Petition for an *Ex Parte* Attachment in the amount of $500,-000.00 on personal property of the debtor consisting of "the inventory, equipment and materials of the business [debtor] undertook on the premises, the manufacture and sale of modular residential buildings." (Cred. Ex. K).

On February 6, 1985 the Writ of Attachment itself was filled out and signed by Dernham's counsel and issued as process of the Hillsborough County Superior Court directed to the "Sheriff of any County or his Deputy". Said Writ of Attachment commanded the sheriff to attach the debtor's personal property at 22 Pine Road, Amherst, Hillsborough County, New Hampshire and that "in the hands of any person at the leased premises in Derry Industrial Park in the County of Rockingham ... to the value of $500,000.00 ..." This Writ of Attachment also commanded the sheriff to "summon said person ... to appear in said COURT ...". (Cred. Ex. K).

On February 7, 1985 a Rockingham County deputy sheriff "attached as the property of Blondheim Modular Manufacturers, Inc. ... all inventory, material, fixtures, and equipment located at Derry Industrial Park ...". "[T]he same being incapable of being conveniently taken into actual possession and in order to preserve [the] said attachment, and within forty-eight hours thereof" the deputy thereupon delivered a copy of the Writ of Attachment

to the Town Clerk for the Town of Derry, New Hampshire. (Cred. Ex. K).

On February 8, 1985 the same Rockingham County Deputy Sheriff "posted notice of attachment on the said property". (Cred. Ex. K).

On February 14, 1985 a Merrimack County Deputy Sheriff "recorded the within attachment made, by leaving a true and attested copy of the [the Writ of Attachment] with the Office of U.C.C. located in the State House Annex in Concord, County of Merrimack for the State of New Hampshire ..." (Cred. Ex. K).

On February 28, 1985 a Hillsborough County Deputy Sheriff "recorded the within attachment by leaving a true and attested copy of the [Writ of Attachment] with the Office of the Town Clerk of Amherst, at Town Hall in Amherst, N.H., County of Hillsborough and State of New Hampshire." (Cred. Ex. K).

On March 1, 1985 a Hillsborough County Deputy Sheriff *"notified* the ... defendant [Blondheim Modular Manufacturers] of [the] above attachments by giving in hand to David L. Williams, Agent of Blondheim Modular Mfg., Inc. ... an attested copy of this [Writ of Attachment] ...". (Cred. Ex. K) (emphasis added).

The Dernham Company admits that no *Writ of Summons* was served upon the debtor until about March 5, 1985. (Dernham's Trial Brief at 5). Contrary to the trustee's argument, the *only* Writ of Summons offered into evidence in this Court (Cred. Ex. F) bears a March, 1985 return day. While Creditor's Exhibit F appears to have been filled out and signed by Dernham's counsel on January 30, 1985, this exhibit does not show, nor does any other exhibit presently before this court show, what service, if any, was actually made of *any Writ of Summons.*

Following the above-described procedural events, by Notice of Hearing, dated April 1, 1985 (Cred. Ex. G), a hearing on the Petition for Ex Parte Attachment was scheduled in the Hillsborough County Superior Court for April 5, 1985. The debtor apparently appeared through counsel at said hearing and contested the attachment (Dernham's Trial Brief at 6).

From the April 5, 1985 hearing resulted the following Superior Court Order:

"Motion to continue was waived. Counsel for both parties being present, and after hearing, the attachment granted on January 30, 1985 is to continue until further order of the Court. Exception noted."

(Cred. Ex. H).

As noted above, it was on May 22, 1985 that Blondheim Modular Manufacturers, Inc. filed its petition for relief in this court. The date ninety days prior to said bankruptcy filing date, is February 21, 1985.

■ The trustee argues first that because Dernham Company admittedly caused the defendant-debtor to be served with the Writ of Attachment without causing the defendant to be "immediately thereafter" served with a Writ of Summons as required by N.H. Superior Court Rule, Page 70.2, there was no underlying lawsuit to support the attachment proceeding. Simply put, the trustee contends that without an underlying lawsuit, an attachment does not secure the payment of any obligation because no obligation exists. The Dernham Company's response to the trustee's argument is that its failure to serve the debtor with a Writ of Summons, immediately after serving it with a Writ of Attachment, is a mere technical deficiency which caused prejudice to no one and further that any possible defect was later cured by the state court's April 5, 1985 order continuing the putative attachment earlier obtained.

This court need not determine whether or not New Hampshire law requires that there be an underlying already-in-existence lawsuit for the plaintiff therein to obtain a pre-judgment attachment, as argued by the trustee. The reason that this court need not reach that question is due to the fact that—without question in the instant matter—at whatever time Dernham's pre-judgment attachment lien actually reached the personal property attached, there *was* an

underlying lawsuit in existence. This follows since under New Hampshire law the operative procedural event bringing a lawsuit into existence occurs "when a plaintiff or his counsel completes a writ with the intention to cause it to be served on the defendant". *Maguire v. Merrimack Mutual Fire Insurance Company*, 125 N.H. 269, 272, 480 A.2d 112 (1984); *Brady v. Duran*, 119 N.H. 467, 469, 403 A.2d 416 (1979); *Hodgdon v. Weeks Memorial Hospital*, 122 N.H. 424, 426, 445 A.2d 1116 (1982) (in New Hampshire a suit at law is commenced when the writ is filled out with a present intention of having it served on the defendant). In short, in New Hampshire procedure, service of a writ or the filing in court thereof, cannot be equated with the "commencement" of a suit and in fact neither is necessary to "commence" a suit. *Maguire v. Merrimack Mutual Fire Insurance Company, supra* 125 N.H. at 272, 480 A.2d 112; *R. Wiebusch*, 4 N.H.P. "Civil Practice & Procedure" §§ 427, 428 (1984).

Hence, in the instant case, Dernham's lawsuit in state court against the debtor "commenced" at the time that Dernham's counsel *filled out* the Writ of Summons with a present intent to cause it to be served on the defendant-debtor, *regardless of what may have later happened to that Writ of Summons and regardless of whether or not or when it was served on the defendant-debtor.* From the evidence before this court I find that Dernham's counsel filled out a Writ of Summons on January 30, 1985 with the then-present intention of having it served on the defendant-debtor. This then was the operative legal event which brought Dernham's lawsuit against the debtor into existence. Alternatively, at the very latest, Dernham's state court lawsuit against the debtor, in which it sought to make the attachment at issue, commenced under New Hampshire procedural law on February 6, 1985, at the time that Dernham's counsel filled out the *writ of attachment* with the then-present intention to cause it to be served on the defendant-debtor. R.S.A. 509:4; *Maguire v. Merrimack Mutual Fire Insurance*

*Company, supra, Brady v. Duran, supra,* and *Hodgdon v. Weeks Memorial Hospital, supra.* Thus, Dernham's state court lawsuit against the debtor "commenced" on January 30, 1985 and no later than February 6, 1985.

■ The trustee argues secondly that Dernham had no attachment lien effectuated long enough before debtor's bankruptcy petition to survive the trustee's attack upon said attachment lien as an avoidable preference. In other words, the contention is that Dernham did not have an effective attachment lien until after the start of the ninety day period prior to bankruptcy prescribed by § 547 of the Bankruptcy Code. As noted above, the date ninety days prior to bankruptcy in the instant matter was February 21, 1985.

I find on the evidence and law that Dernham Company did in fact have an attachment lien on debtor's personal property which was effective before February 21, 1985, for the following reasons: (1) on January 30, 1985 Dernham Company obtained a Superior Court order granting its petition for an ex parte attachment; (2) on February 2, 1985 the Dernham Company changed the locks on the premises that had been leased to the debtor and denied the debtor access to the same; (3) on February 7, 1985 a Rockingham County deputy sheriff went to the premises leased by Blondheim Modular Manufacturers, Inc. and "attached" its property at that Derry, New Hampshire location and on that same date delivered a copy of the Writ of Attachment to the Town Clerk for the Town of Derry, New Hampshire; (4) on February 8, 1985 the same Rockingham County deputy sheriff "posted notice of attachment on the said property"; and (5) on February 14, 1985 a Merrimack County deputy sheriff recorded the Writ of Attachment with the Office of U.C.C. at the State House Annex in Concord, New Hampshire.

Each and all of these events took place prior to the February 21, 1985 start of the ninety day preference period. Under RSA 511:23 and *Scott v. Manchester Print*

*Works,* 44 N.H. 507 (1880), *Johnson v. Farr,* 60 N.H. 426 (1880), and *Cary Brick Co. v. Tilton,* 208 F. 497 (D. 1st Cir.1913), the above-described actions by the plaintiff-Dernham, the state court, and the respective sheriffs were sufficient to give rise to an attachment lien on debtor's "bulky articles" of personal property and to perfect said attachment lien. The foregoing actions effectively seized the property in question and denied the debtor all access to the same. These actions also gave "notice to the world" of the attachment lien in question, not only by the posting the notice of attachment on the locked door of the premises, but also by recording in the appropriate town and state offices. No outside party dealing with the debtor on February 21, 1985 would have been without notice of the attachment lien on the personal property. In these circumstances, I believe that the underlying purposes of statutory provisions requiring seizure and notice to perfect an attachment lien valid against innocent outside parties were fully satisfied in the present case by the critical date.

This court realizes that RSA 511–A:5 contains conflicting statutory language that might be interpreted as requiring service of an RSA 511–A:2 "notice of intent to attach" on the defendant to make any attachment lien "effective" or to bring one into existence. Whatever sense this may make in the case of pre-judgment attachments following notice, it makes no sense whatsoever in the case of *ex parte attachments* made pursuant to RSA 511–A:8 which are, by definition, made without prior notice on the defendant. *Accord,* R. Wiebusch, 4 N.H.P., "Civil Practice and Procedure" § 588 (1984). Accordingly, the irreconcilable statutory provision within RSA 511–A:5 does not, in my judgment, take away from the special provisions for ex parte attachments in RSA 511–A:8, and the special provisions for attachments of "bulky articles" of personal property in RSA 511:23.

Accordingly, I conclude that Dernham Company had a valid and effective pre-judgment attachment lien on the debtor's personal property in question, and that the

same was effective prior to the February 21, 1985 start of the ninety day preference period. Dernham Company is thus a secured creditor in the instant bankruptcy proceeding to cover its "excess claim" not covered by its security deposit.

### CONCLUSION

Based upon the foregoing findings and conclusions, Dernham Company is determined to have a total allowable claim relating to the lease in question in the amount of $37,610.63, plus any amount that is allowable as reasonable attorney fees and expenses concerning collection and eviction proceedings. The record in this adversary proceeding is insufficient however to make an appropriate allowance of such fees and expenses, in light of the court's rulings herein determining Dernham's rights under the lease.

The parties shall have 30 days from the date of this opinion within which to settle upon a form of judgment incorporating a suggested amount of fees and expenses to be allowed in that regard, consistent with the rulings made herein, failing which the Clerk shall set this matter down for a further hearing on that aspect only.